# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

THOMAS G. FELSKI,

              **Plaintiff,**

      **v.**                          **Case No. 16-CV-1062**

DAVID A. BRETL,
CINDY WROBEL,
KRISTEN PERRY,
CHIEF JIM SURGES, and
SGT. PAUL SCHMIDT,

              **Defendants.**

## DECISION AND ORDER

Plaintiff Thomas Felski is a Wisconsin state prisoner representing himself. He filed this case alleging that forty-one defendants violated his rights related to a criminal investigation and criminal charges that were filed against him stemming from a home construction contract. The court screened the original complaint, determined that Felski's allegations against five of the forty-one defendants implicated his rights under the Fourth Amendment, dismissed the remaining claims and defendants, and ordered Felski to file an amended complaint clarifying his claims against the five remaining defendants. (ECF No. 9 at 24.)

After Felski filed an amended complaint, the court screened it and allowed him to proceed on the following claims under the Fourth Amendment: (1) a claim against defendant East Troy Police Department Sergeant Paul Schmidt for allegedly illegally entering Felski's residence and seizing his personal items, as well as a claim against defendant East Troy Police Department Chief Jim Surges for authorizing the alleged illegal entry; (2) claims against defendant Cindy Wrobel, a humane officer at Lakeland Animal Welfare Society, Inc. (Lakeland), for allegedly seizing Felski's dogs and charging him $4,000 for their return, and against defendants Wrobel and Kristen Perry, a supervisor at Lakeland, for neutering Felski's puppy; and (3) a claim against defendant Walworth County Corporation Counsel David Bretl for failing to prevent Wrobel's and Perry's actions. All defendants have moved for summary judgment. (ECF Nos. 72, 79, 87.) In addition to responding to the summary judgment motions (ECF No. 127), Felski filed several motions to strike. (ECF Nos. 139, 141, 143, 143.)

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73 (E.D. Wis.).

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### SURGES'S AND SCHMIDT'S
### MOTION FOR SUMMARY JUDGMENT

In his amended complaint Felski alleges that "Defendant, Paul Schmidt of the East Troy Police Department did illegally enter my private residence and seized two personal computers, business records, checks, and original contracts without a search

warrant in violation of the 4th Amendment to the United States Constitution." (ECF No. 12, ¶ 10.) He further alleges that "Defendant, Jim Surges authorized the illegal entry by his subordinate, Paul Schmidt, which is [in] violation of the 4th Amendment to the United States Constitution." (ECF No. 12, ¶ 14.)  In moving for summary judgment, Chief Surges and Sgt. Schmidt deny that any member of the East Troy Police Department, including Sgt. Schmidt, entered Felski's home or removed any items from it.

## A. Relevant Facts

The following facts are taken from Surges's and Schmidt's Proposed Findings of Fact (ECF No. 74) and from Felski's deposition (ECF Nos. 75-1, 75-2). Felski did not respond to Surges's and Schmidt's facts, as required by the Local Rules. *See* Civil L.R. 56(b)(2)(B) (E.D. Wis.).[1] Thus, the court may consider the defendants' facts undisputed. *See* Civil L.R. 56(b)(4) (E.D. Wis.). Felski filed a joint response to all three motions for summary judgment. (ECF No. 127.) The response is titled, "Plaintiff's Response to Defendants Proposed Findings of Fact," "Memorandum of Law," and "Plaintiff's

---

[1] Under this court's Local Rules, "If a party is proceeding pro se in civil litigation and the opposing party files a motion for summary judgment, counsel for the movant must "provide the pro se party copies of the relevant federal and local rules and advise  the pro se party that "any factual assertion in the movant's affidavit, declaration, or other admissible documentary evidence will be accepted by the Court as being true unless the party unrepresented by counsel submits the party's own affidavit, declaration, or other admissible documentary evidence contradicting the factual assertion." Civ. L.R. 56(a) (E.D. Wis.). It appears only Kristen Perry and Cindy Wrobel complied with this rule. (ECF No. 87.) Because Felski received the required information from Perry and Wrobel, the other defendants' failure to comply with the local rule is harmless. Felski was informed of the consequences of failing to respond to the movants' proposed findings of fact.

Response to Motion for Summary Judgment from David Bretl, James Surges, Paul Schmidt, Kristen Perry, Cindy Wrobel by their Attorneys." Because Felski's response is sworn, the court will consider any properly supported, relevant, material facts from his response in resolution of the summary judgment motions. *See* 28 U.S.C. § 1746.

In 2011 Felski resided at N9144 Ash Street in the town of East Troy, Wisconsin (the "Ash Street Property"). (ECF No. 74, ¶ 4.) He operated a home repair and remodeling business. (*Id.*, ¶ 6.) Mary Joan Wienk[2] assisted him with the operation of the business. (*Id.*) Wienk lived next door to Felski (ECF No. 75-2 at 186-87) and had unrestricted access to Felski's house by virtue of having a key and knowing his garage code (ECF No. 75-2 at 57).

In April 2011 Felski was arrested and confined in the Walworth County Jail. (ECF No. 74, ¶ 5.) Felski remained incarcerated until November 2011. (ECF No. 75-2 at 217.) While he was incarcerated, Wienk took care of Felski's house. (*Id.* at 134-35.)

As stated above, Felski alleges that (apparently while he was incarcerated) Sgt. Schmidt illegally entered Felski's residence and seized two personal computers, business records, checks and original contracts without a search warrant. (ECF No. 12, ¶ 10.) He further alleges that Chief Surges authorized the illegal entry into Felski's residence by Sgt. Schmidt. (*Id.*, ¶ 14.)

---

[2] Wienk's name is often spelled "Wenke" in the record (*see, e.g.*, ECF Nos. 73 at 3; 74, ¶ 6; 77, ¶ 5; 80, ¶ 11), which is how Felski spelled her name at his deposition (ECF No. 75-2 at 2). She is also often referred to as "Mary Jo" (*see, e.g.*, ECF Nos. 73 at 6; 75-2 at 2; 81 at 3). According to her own affidavit, her name is "Mary Joan C. Wienk" (ECF No. 134) and thus this is how the court will refer to her.

The East Troy Police Department *did* during Felski's incarceration come into possession of certain property allegedly belonging to him. (ECF No. 74, ¶ 12.) Wienk provided the laptop computer to Sgt. Schmidt, who in turn gave it to Felski. (*Id.*) Wienk also gave the police department a Dell CPU Computer, Dell Computer Keyboard, Dell Printer, and Balance flat screen monitor allegedly owned by Felski. (*Id.*, ¶ 13.)

Felski was asked at his deposition the basis for his allegation that Sgt. Schmidt conducted a search of and seized property from Felski's Ash Street Property. (ECF No. 74, ¶ 11.) Felski could not articulate any factual basis for the allegation. (*Id.*) The only basis for his belief that the police searched his house and seized certain items was the fact that he learned that the items were at the police station. (ECF No. 75-2 at 204-06.) When asked if he knew how the police came to have possession of the items, Felski testified, "I don't know." (*Id.* at 222-23.)

Felski was also asked the basis for his allegation that Chief Surges authorized the alleged illegal entry into the Ash Street Property. (ECF No. 74, ¶ 8.) Felski testified that he simply assumed that Chief Surges authorized the entry by Sgt. Schmidt. (*Id.*) Chief Surges denies that he authorized any member of the East Troy Police Department, including Sgt. Schmidt, to conduct a search of the Ash Street Property; in fact, he denies that the East Troy Police Department, including Sgt. Schmidt, conducted a search of or seized any property from the Ash Street Property. (*Id.*, ¶ 9.)

**B.     Analysis**

Felski's claim against Chief Surges and Sgt. Schmidt is wholly without support. All Felski can muster is his unfounded assumption that, because the police were in possession of some items from his home, the police must have unlawfully accessed his home and seized his property. Felski has absolutely no evidence that Sgt. Schmidt entered his home or that Chief Surges authorized any search and seizure. The undisputed evidence is that the police came into possession of certain items from Felski's home because they were lawfully given to the police by Wienk.

Because the undisputed evidence demonstrates that Felski's claim is baseless, the court will grant Surges's and Schmidt's motion for summary judgment.

**MOTIONS FOR SUMMARY JUDGMENT BY BRETL, WROBEL AND PERRY**

**A.     Relevant Facts**

The following facts are taken from the Joint Proposed Findings of Fact submitted by defendants Bretl, Wrobel, and Perry (ECF No. 80), to which Felski did not respond as required by the Local Rules. *See* Civil L.R. 56(b)(2)(B) (E.D. Wis.). Thus, the court accepts the defendants' facts as undisputed. *See* Civil L.R. 56(b)(4) (E.D. Wis.). As stated above, Felski filed a joint response to all three defendants' motions for summary judgment. (ECF No. 127.) Because Felski's response is sworn the court will consider any properly supported, relevant, material facts from his response in resolution of the summary judgment motions. *See* 28 U.S.C. § 1746.

In 2011 Felski owned six German Shepherd dogs. (ECF No. 80, ¶ 1.) The dogs were kept in the garage and backyard of Felski's Ash Street Property. (*Id.*, ¶ 2.) Three of the dogs were fully-grown and three were still puppies, with two female puppies and one male puppy. (*Id.*, ¶ 3.)

In August 2011 Felski was arrested and taken to into custody at the Walworth County Jail ("Jail"), where he remained until he was released in November 2011. (ECF No. 80, ¶¶ 5-6.) A few days after he was arrested, Felski was granted "work-release privileges" and allowed to leave the Jail in order to work at a remodeling/remediation business he owned and operated at the time. (*Id.*, ¶ 7.) While out of jail on work-release, Felski was able to feed and take care of the dogs. (*Id.*, ¶ 8.)

In September 2011 Felski's work-release privileges were revoked after he failed a breathalyzer test after returning to the jail from work-release. (ECF No. 80, ¶ 9.) Because he was no longer allowed to leave the jail, he was not able to feed or take care of the dogs. (*Id.*, ¶ 10.)

While Felski was incarcerated, Wienk stayed at the Ash Street Property to "take care of the house." (ECF No. 80, ¶ 11.) Wienk had a key to Felski's house, knew the access code to the garage door, and had unrestricted access to the Ash Street Property. (*Id.*, ¶ 12.) After Felski's work-release privileges were revoked, Wienk agreed to become the primary caretaker for Felski's dogs. (ECF No. 80, ¶ 15.)

Shortly after Wienk agreed to be responsible for feeding and taking care of the dogs, one of the male dogs knocked her down while she was trying to move him from the kennel to the fenced-in yard for exercise. (ECF No. 80, ¶ 16.) Wienk eventually decided that she no longer wanted to care for the dogs. (*Id.*, ¶ 17.) On September 5, 2011, and again on September 10, 2011, Wienk told Felski over the jail's recorded phone line that she planned on contacting the humane society to take the dogs because she no longer wanted to feed or take care of them. (*Id.*, ¶ 18.)

On September 21, 2011, Wienk called Lakeland. (ECF No. 80, ¶ 19.) During the call, Wienk spoke with Lakeland employee defendant Cindy Wrobel and told her that she was Felski's girlfriend and had assumed responsibility for feeding and taking care of the dogs. (*Id.*, ¶ 20.) Wienk described the dogs as being kept in kennels in the garage of the Ash Street Property and submitted a complaint of animal neglect/cruelty. (*Id.*) Wienk told Wrobel that Felski was unable to feed or take care of the dogs because he was incarcerated at the jail. (*Id.*, ¶ 21.) Wienk also told Wrobel that she was no longer willing to continue purchasing food for the dogs or willing to continue feeding and taking care of the dogs. (*Id.*, ¶ 22.) Wienk told Wrobel that one of the male dogs knocked her down while she was trying to move him from the kennel to the fenced in yard for exercise. (*Id.*, ¶ 23.)

After the call Wrobel took two bags of dog food from Lakeland to the Ash Street Property so the dogs could be fed and so Wrobel could perform a wellness check on the

dogs. (ECF No. 80, ¶ 24.) When Wrobel arrived at the Ash Street Property, Wienk was standing outside of the open garage. (*Id.*, ¶ 25.) Wrobel could see the that the dogs were malnourished and emaciated. (*Id.*) Wrobel determined that alternate arrangements were needed for the care and custody of the dogs. (*Id.*)

In late September 2011 Wrobel contacted the jail and spoke with Felski to discuss arrangements for the care and custody of the dogs. (ECF No. 80, ¶ 28.) Wrobel informed Felski that Wienk had contacted Lakeland and had submitted a complaint of animal neglect/cruelty. (*Id.*, ¶ 29.) Wrobel told Felski that Wienk was no longer willing to continue feeding or taking care of the dogs. (*Id.*, ¶ 30.) Felski gave Wrobel the phone numbers of various friends and family members whom he believed would be willing to feed and take care of the dogs. (*Id.*, ¶ 31.) Wrobel attempted to contact the individuals identified by Felski (*Id.*, ¶ 32) but was unable to find anyone to assume responsibility for feeding and taking care of the dogs. (*Id.*, ¶ 33.)

According to the defendants, because no one was willing to take care of the dogs, Felski consented to Wrobel taking possession of the dogs for their own well-being. (ECF No. 80, ¶ 34.) Felski gave Wrobel the access code to the Ash Street Property garage door so that she could get the dogs. (*Id.*, ¶ 35.) Felski denies giving Wrobel permission to take the dogs from the Ash Street property. (ECF No. 127 at 9.)

On October 5, 2011, Wrobel went to the Ash Street Property to pick up the dogs. (ECF No. 80, ¶ 37.) When she arrived, Wienk was again standing outside of the open

garage. (*Id.*, ¶ 39.) Wrobel could see the six dogs, whose appearance confirmed the need to take them. (*Id.*, ¶ 40.)

Before entering the garage, Wrobel spoke with Wienk. (ECF No. 80, ¶ 41.) Wienk confirmed that she was no longer willing to purchase food for the dogs or feed and take care of them. (*Id.*, ¶ 42.) Wienk gave Wrobel consent to enter the garage and take the dogs. (*Id.*, ¶ 43.) Wrobel took the dogs back to Lakeland. (*Id.*, ¶ 44.)

The following day, October 6, 2011, Wrobel called Felski at the jail to notify him that she had transported the dogs to Lakeland and that the dogs were being kept there. (ECF No. 80, ¶¶ 47-48.) Wrobel explained to Felski that Lakeland would return the dogs to Felski if he or someone on his behalf could take care of them and if Felski or someone on his behalf paid all applicable fees associated with the custody, care, and treatment of the dogs. (*Id.*, ¶ 49.) No one claimed the dogs between October 6, 2011, and October 27, 2011. (*Id.*, ¶ 50.)

On October 27, 2011, Lakeland sent Felski a "7-Day Written Notice," which Felski admits having received and read. (ECF No. 80, ¶ 51.) The written notice stated, among other things, that the dogs were still being kept at Lakeland, that the fees associated with their custody, care and treatment were continuing to accrue, and that Felski had "7 days from the date of this letter to come to [Lakeland] and pay ALL fees associated with the cost of custody, care and treatment which … will continue to increase daily…[.]'" (*Id.*, ¶ 52.) The written notice stated that "at the end of the 7-day period … the dogs will

be considered unclaimed and become the sole property of [Lakeland]." (*Id.*, ¶ 54.) The notice explained that Felski "may file for return [of the dogs] by following Wis. State Statute § 173.32(1) Petition (Review of seizure or withholding) which states that a person claiming that an animal that he or she owns was improperly taken into custody under 173.13(8) (a violation of 951) or is wrongfully withheld under 173.21(1), you may seek return of the animal(s) by petitioning for an order from the circuit court of Walworth County…." (*Id.*, ¶ 53.)

Around the time Felski received the written notice, he retained attorneys Paul Volbrecht and Chris Kuehn as legal counsel to assist him in seeking return of the dogs. (ECF No. 80, ¶ 55.) All further correspondence from Lakeland to Felski was sent to Felski's attorneys. (*Id.*, ¶ 56.) Neither Felski nor anyone on his behalf paid the fees associated with the care and custody of the dogs or went to Lakeland to reclaim the dogs within the specified seven-day period. (*Id.*, ¶ 57.) Nor was Lakeland ever notified of a petition for return of the dogs having been filed. (*Id.*, ¶ 59.)

Felski states that he filed a "petition" with a court objecting to the seizure of his dogs. (*See* ECF No. 127-1 at 2-3.) He states that the Clerk of Court deemed his situation a civil matter and returned the petition to him. (ECF No. 127 at 12.)

On November 9, 2011, Lakeland sent Felski's attorneys a letter stating, in part, that "[s]ince there has been a failure to file by the specified 7-day (Wis. Stat. 173.19) time period as was stated in the [October 27th] letter, sole custody of the 6 German

be considered unclaimed and become the sole property of [Lakeland]." (*Id.*, ¶ 54.) The notice explained that Felski "may file for return [of the dogs] by following Wis. State Statute § 173.32(1) Petition (Review of seizure or withholding) which states that a person claiming that an animal that he or she owns was improperly taken into custody under 173.13(8) (a violation of 951) or is wrongfully withheld under 173.21(1), you may seek return of the animal(s) by petitioning for an order from the circuit court of Walworth County…." (*Id.*, ¶ 53.)

Around the time Felski received the written notice, he retained attorneys Paul Volbrecht and Chris Kuehn as legal counsel to assist him in seeking return of the dogs. (ECF No. 80, ¶ 55.) All further correspondence from Lakeland to Felski was sent to Felski's attorneys. (*Id.*, ¶ 56.) Neither Felski nor anyone on his behalf paid the fees associated with the care and custody of the dogs or went to Lakeland to reclaim the dogs within the specified seven-day period. (*Id.*, ¶ 57.) Nor was Lakeland ever notified of a petition for return of the dogs having been filed. (*Id.*, ¶ 59.)

Felski states that he filed a "petition" with a court objecting to the seizure of his dogs. (*See* ECF No. 127-1 at 2-3.) He states that the Clerk of Court deemed his situation a civil matter and returned the petition to him. (ECF No. 127 at 12.)

On November 9, 2011, Lakeland sent Felski's attorneys a letter stating, in part, that "[s]ince there has been a failure to file by the specified 7-day (Wis. Stat. 173.19) time period as was stated in the [October 27th] letter, sole custody of the 6 German

Shepherds now belongs to [Lakeland], Wis. Stat. 173.23(1m) Unclaimed Animals." (ECF No. 80, ¶ 60; ECF No. 85-1 at 25.) Felski disputes that Lakeland sent the November 9, 2011 letter to his attorneys. (ECF No. 127 at 12.)

The dogs were kept at Lakeland from October 5, 2011, until November 16, 2011. (ECF No. 80, ¶ 61.) During that time, Lakeland provided the dogs with necessary medical exams, vaccinations, and immunizations. (*Id.*, ¶ 62.) Lakeland neutered the male puppy on November 15, 2011, in anticipation of an adoption and pursuant to Lakeland's policies and procedures. (*Id.*, ¶ 63.) The custody and care provided to the dogs was prescribed by Lakeland's policies and cost $4,000. (*Id.*, ¶ 64.) On November 16, 2011, Felski paid $4,000 to Lakeland for the care of the dogs, and the dogs were returned to him. (*Id.* ¶ 65.)

Defendant Dave Bretl served as the Walworth County Corporation Counsel during all of the events at issue in this lawsuit. (ECF No. 80, ¶ 66.) Bretl was not, and has never been, employed by Lakeland. (*Id.*, ¶ 67.) Felski has never spoken or e-mailed with Bretl. (*Id.*, ¶ 68.) Bretl did not participate in any of the events relating to the entry onto Felski's residential premises, the seizure of the dogs, the custody and care of the dogs, or the neutering of the male puppy. (*Id.*, ¶¶ 69-71.)

Before Bretl was served with a copy of the Summons and Complaint in this case, he was unaware that Lakeland had received an animal cruelty/neglect complaint from Wienk, that Wienk was not willing to continue feeding or taking care of the dogs, that

Wrobel attempted, but was unable, to locate anyone to feed and take care of the dogs, that Wrobel planned to enter and/or entered the Ash Street Property on October 5, 2011, that the dogs were seized, that Lakeland kept the dogs in its possession from October 5, 2011 until November 16, 2011, that Lakeland provided the dogs with medical exams, vaccinations and immunizations, that Lakeland neutered the male puppy on November 15, 2011, or that Lakeland charged and received $4,000 for the custody and care of the dogs. (ECF No. 80, ¶¶ 72-81.) Bretl did not have the authority to control Lakeland's actions or to prevent the foregoing conduct or events from occurring. (*Id.,* ¶ 82.)

As for defendant Kristen Perry, an employee of Lakeland, Felski has no information indicating that Perry had anything to do with Wrobel picking up the dogs. (ECF No. 80, ¶ 84.) Nor does Felski have any information that Perry directed staff to neuter the male puppy. (*Id.,* ¶ 85.) Although Felski interacted with Perry when he paid the $4,000 to obtain the return of the dogs and found her to be "informed," he does not know if she ordered any action which would form a basis for the case against her. (*Id.,* ¶ 86.)

**B.    Analysis**

**1.    Bretl**

In an attempt to support his claim against Bretl, Felski argues that, "[a]s an apparently qualified attorney, as he does hold the position of Corporation Counsel for Walworth County, we can presume [Bretl] would have familiarized himself with the

details of the case." (ECF No. 127 at 12.) Felski also references an October 8, 2011 letter which discusses the fees associated with the care and custody of the dogs by Lakeland. Based on the fact that Walworth County Assistant Corporation Counsel Michael Cotter was copied on the letter, Felski contends that "we have to presume that Corporation Counsel Bretl, as head of the Corporate Counsel's Office, was made aware of this." (*Id.* at 13.)

Felski has failed to present any evidence that Bretl was involved in or was even aware of the events related to the seizure of the dogs or the subsequent neutering of one. Nor is there any evidence to find that Bretl had the authority or ability to prevent the complained-of conduct. Consequently, Felski's claims against Bretl fail. *See Burks v. Raemisch*, 555 F.3d 592, 595-96 (7th Cir. 2009) ("public employees are responsible for their own misdeeds but not for anyone else's"); *Hildebrandt v. Ill. Dep't of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003) ("For a defendant to be liable under § 1983, he or she must have participated directly in the constitutional violation."); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.").

But even if Bretl was aware of the seizure of the dogs and related events, as discussed below these events were wholly lawful, and thus no basis could plausibly

exist for a claim against Bretl. The court will therefore grant defendant Bretl's motion for summary judgment.

### 2.      Perry and Wrobel

Felski's claims against Perry and Wrobel are also without merit. Felski acknowledges that Wienk agreed to care for the dogs and had access to the garage in order to do so. (ECF No. 127 at 4.) It is undisputed that Wienk consented to Wrobel taking possession of the dogs. (ECF No. 80, ¶ 43.) Although Felski argues Wienk no longer was authorized to enter the garage after she told Felski she no longer wanted to care for the dogs (ECF No. 127 at 5), even if true that does not support a claim against Perry or Wrobel.

Wrobel's actions were lawful if Wienk had the apparent authority to consent to Wrobel entering the garage and taking custody of the dogs. *See United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009). "Under the apparent authority type of third-party consent, the government must show that a reasonable person, with the same knowledge of the situation as that possessed by the government agent to whom consent was given, would reasonably believe that the third party had authority over the area to be searched." *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990); *United States v. Chaidez*, 919 F.2d 1193, 1201 (7th Cir. 1990)); *see also United States v. Ryerson*, 545 F.3d 483, 489 (7th Cir. 2008) ("Such authority exists when the facts available to an officer at the time of a search would allow a person

of reasonable caution to believe that the consenting party had authority over the premises."); *United States v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010) ("An officer can conduct a search when the facts available at the time 'warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" (quoting *Rodriguez*, 497 U.S. at 188)). "An officer has 'a duty to inquire further as to a third party's authority to consent to a search, if the surrounding circumstances make that person's authority questionable." *United States v. Alexander*, 573 F.3d 465, 474 (7th Cir. 2009) (quoting *United States v. Goins*, 437 F.3d 644, 648 (7th Cir. 2006)).

The undisputed facts establish that Wienk had apparent authority over the garage and the dogs. Wienk told Wrobel she was Felski's girlfriend and she had been caring for and feeding the dogs held in kennels in Felski's garage while he was in jail. (ECF No. 80, ¶¶ 20-21.) When Wrobel first went to the property, she met with Wienk, who was standing outside the open garage. (ECF No. 80, ¶ 25.) Wienk again was standing outside the open garage when Wrobel returned to the property days later. (ECF No. 80, ¶ 39.) Any reasonable person in Wrobel's position would have believed Wienk had the authority to consent to Wrobel entering the garage and taking possession of the dogs. *See United States v. Rodriguez*, 888 F.2d 519, 523 (7th Cir. 1989) (possession of key gave apparent authority to consent to search); *see also Pineda-Buenaventura*, 622 F.3d at 777; *Ryerson*, 545 F.3d at 489.

Not only was Wrobel authorized to seize the dogs pursuant to Wienk's consent, but Wisconsin state law separately provided Wrobel with the authority to seize the dogs if she had "reasonable grounds" to believe they were abandoned or if they were "unwanted animal[s] delivered to the humane officer…." *See* Wis. Stat. § 173.13(1)(a)1. The reasonable grounds standard is equivalent to a probable cause standard under the Fourth Amendment. *See Cooper v. Pionke*, 2015 WL 1781721, at *5 (W.D. Wis. April 20, 2015) (citing *Mahne v. Garrigan*, 428 F. App'x 630, 633 (7th Cir. 2011)). Probable cause exists if the facts and circumstances available would justify a reasonable person believing that the dogs had been abandoned or were unwanted. *See id.*

Wienk told Wrobel that the dogs' owner was in jail and that, although she had been caring for the dogs, she was unwilling to continue to do so. This readily establishes reasonable grounds to believe the dogs were abandoned or unwanted.

Consistent with Wisconsin law, Felski had seven days in which to pick up the dogs and pay all fees associated with the dogs' custody, care, vaccination, and treatment. *See* Wis. Stat. §§ 173.19, 173.23(1m). Lakeland sent Felski a letter on October 27, 2011, informing him of his obligation to retrieve the dogs and that, if he failed to do so within seven days, the dogs would become the property of Lakeland. (ECF No. 80, ¶¶ 51-54.) On November 15, 2011, Lakeland neutered one of the dogs. (ECF No. 80, ¶ 63.) Doing so was wholly lawful. By that time, under Wisconsin law and as a result of Felski failing to retrieve the dogs and pay the expenses associated with their care, the

dogs had become the property of Lakeland for it to dispose of as it saw fit. *See* Wis. Stat. § 173.23(1m).

Thus, defendants Wrobel and Perry are entitled to summary judgment. Perry is also entitled to judgment because, as a supervisor at Lakeland, she has not been shown to have had any personal involvement in the search of the garage, the seizure of the dogs, or their care. *See Hildebrandt*, 347 F.3d at 1039.

## PLAINTIFF'S REMAINING MOTIONS

Felski has filed four letters in which he contends that the court should not admit "new evidence" the defendants submitted along with their summary judgment reply briefs. (ECF Nos. 139, 141, 142, 143.) All four letters are identical, save for the addition of the following sentence in the last three letters: "If the court would prefer that I file a motion to exclude this late evidence, [please] [a]dvise." In the letters Felski asks that the court not consider evidence submitted by the defendants in reply that he characterizes as "newly entered evidence consisting of answers to Interrogatories and the Production of documents" and which he states is being "entered past the deadline of discovery." The court understands Felski to be objecting to the following, which the defendants submitted in conjunction with their reply briefs:

> o Supplemental affidavit of Attorney Robert F. Johnson, attached to which are James Surges and Paul Schmidt's Responses to Plaintiff's First Request for Production of Documents; James Surges's Answers to Plaintiff's First Set of Interrogatories; and Paul Schmidt's Answers to Plaintiff's First Set of Interrogatories. (ECF No. 129.)

o Supplemental affidavit of Paul Schmidt, in which he avers a Walworth County Sheriff's Department captain provided him with certain documents on September 21, 2011. This was Schmidt's first contact with the captain regarding Felski. Also attached to the affidavit "is a copy of a Town of East Troy Police Department Day Book Entry for October 6, 2011 with attached letter prepared by Cindy Wrobel of the Lakeland Animal Welfare Society, Inc. relative to the removal of Mr. Felski's dogs by her on October 5, 2011. (ECF No. 130.)

o Affidavit of Mary Joan C. Wienk wherein she avers she was Felski's girlfriend in 2011; she helped take care of his business and home while he was incarcerated in August and September of 2011; she had a key to the home and the access code to the garage; she decided she could no longer care for the dogs; she called Lakeland and said she would no longer care for the dogs and could not find anyone else to do so; and she asked Wrobel to take the dogs and gave her permission to enter the garage to do so. (ECF No. 134.)

o Affidavit of Attorney Colin J. Casper, to which he attaches the "Contract Agreement for Walworth County Animal Control Services between the LAWS and Walworth County." (ECF Nos. 137, 137-1.)

A movant cannot present for the first time in reply an affidavit that raises new issues or arguments as to the nonmovant's claims. *See RBS Citizens, N.A. v. Akhtar Ramzanali*, No. 09 C 05248, 2011 U.S. Dist. LEXIS 70034, at *4 (N.D. Ill. June 29, 2011); *see also Hutchins v. Clarke*, No. 07-C-0526, 2009 U.S. Dist. LEXIS 140334, at *20 (E.D. Wis. Jan. 16, 2009) ("a reply affidavit filed as part of a summary judgment reply may not raise new evidence or advance new factual propositions"). But "[t]here is no blanket prohibition from filing additional affidavits when a movant for summary judgment files a reply brief following a nonmovant's response." *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 318 (7th Cir. 2003) (citing *Egger v. Phillips*, 710 F.2d

292, 295 (7th Cir. 1983)). A movant may offer additional affidavits in reply if it is to, for example, rectify an evidentiary deficiency with respect to previously proffered evidence or provide further foundational support for the movant's statement of material facts. *See RBS Citizens, N.A. v. Akhtar Ramzanali*, No. 09 C 05248, 2011 U.S. Dist. LEXIS 70034, at *4 (N.D. Ill. June 29, 2011). Thus, "where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers - both briefs and affidavits - may properly address those issues." *Catley v. Graphic Communs. Int'l Union, Local 277-M*, 982 F. Supp. 1332, 1335 (E.D. Wis. 1997) (quoting *Baugh v. City of Milwaukee*, 823 F. Supp. 1452, 1457 (E.D. Wis. 1993)).

The affidavits and additional documents submitted by the defendants in reply were each offered in direct response to matters placed in issue by Felski in his response and do not spring upon him any new basis for the defendants' motions. Accordingly, the court concludes each was properly submitted. Therefore, it will deny Felski's motions to strike. But ultimately this issue is immaterial because none of this supplemental evidence factored into the court's decision.

Finally, following the completion of all briefing Felski filed a "Motion for Appointment of Counsel." (ECF No. 148.) Having concluded that Felski's claims are wholly without merit and that the defendants are entitled to summary judgment, this motion is moot.

**IT IS THEREFORE ORDERED** that defendants Schmidt and Surges's motion for summary judgment (ECF No. 72) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant Bretl's motion for summary judgment (ECF No. 79) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants Perry and Wrobel's motion for summary judgment (ECF No. 87) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motions to strike (ECF Nos. 139, 141, 142, 143) are **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to appoint counsel (ECF No. 148) is **DISMISSED AS MOOT**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED** and the Clerk of Court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of September, 2018.

WILLIAM E. DUFFIN
U.S. Magistrate Judge